# United States Court of Appeals
## For the First Circuit

No. 14-1423

UNITED STATES and COMMONWEALTH OF MASSACHUSETTS ex rel. JULIO ESCOBAR and CARMEN CORREA, Administratrix of the Estate of Yarushka Rivera,

Plaintiffs, Appellants,

v.

UNIVERSAL HEALTH SERVICES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Stahl, and Barron,
Circuit Judges.

Matthew P. McCue, with whom Law Office of McCue was on brief, for appellants.
Mark W. Pearlstein, with whom Laura McLane, Evan D. Panich, and McDermott Will & Emery LLP were on brief, for appellee.
Robert Ross, with whom Steven Sharobem and Martha Coakley, Attorney General, were on brief, for Commonwealth of Massachusetts, amicus curiae.
Jennifer M. Verkamp and Morgan Verkamp LLC, on brief for Taxpayers Against Fraud Education Fund, amicus curiae.

March 17, 2015

**STAHL, Circuit Judge**.  The genesis of this False Claims Act case was the care of Relators' daughter at Arbour Counseling Services in Lawrence, Massachusetts.  Relators alleged that their daughter — who died of a seizure in 2009 — was treated by various unlicensed and unsupervised staff, in violation of state regulations.  The crux of their complaint is that Arbour's alleged noncompliance with sundry supervision and licensure requirements rendered its reimbursement claims submitted to the state Medicaid agency actionably false under both the federal and Massachusetts False Claims Acts.

The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  With one limited exception, we reverse.

## I.  Facts & Background

A.  <u>Regulatory framework</u>

Arbour Counseling Services ("Arbour"), owned and operated by Defendant-Appellee Universal Health Services, Inc. ("UHS"), is a provider of mental-health services in Lawrence, Massachusetts.[1]  Arbour participates in the state Medicaid program, known as MassHealth, and bills MassHealth for services rendered to individuals insured by the program.

---

[1] We use the name "Arbour" here to refer specifically to the clinic that treated Yarushka Rivera in Lawrence.

-3-

The state has promulgated regulations governing the MassHealth program. See generally 130 Mass. Code Regs. §§ 401.401–650.035.[2]  Chapter 429 in particular pertains to the provision of mental-health services at both "parent centers" and "satellite facilities" around the state.[3]  In the regulations, a satellite facility, such as the Arbour clinic at issue in this case, is a "mental health center program at a different location from the parent center that operates under the license of and falls under the fiscal, administrative, and personnel management of the parent center."  Id. § 429.402.  Satellite facilities are classified as either "autonomous" or "dependent"; autonomous facilities have "sufficient staff and services to substantially assume [their] own clinical management independent of the parent center," while dependent facilities operate "under the direct clinical management of the parent center."  Id.

The regulations contemplate that mental health centers will employ qualified "core" staff members engaged in disciplines such as psychiatry, psychology, social work, and psychiatric nursing.  See id. § 429.422 (setting forth staff composition

---

[2] The most up-to-date version of the Code of Massachusetts Regulations are accessible at http://www.mass.gov/courts/case-legal-res/law-lib/laws-by-source/cmr/ (last visited March 5, 2015).

[3] Chapter 429 sets forth regulations specific to the provision of mental-health services.  For administrative and billing regulations generally applicable to all MassHealth providers, see Chapter 450, 130 Mass. Code Regs. §§ 450.101–450.331.

requirements); id. § 429.424 (setting forth requisite staff qualifications). All staff must receive supervision within a formalized relationship, commensurate to the individual's skill and level of professional development. Id. § 429.438(E). Noncore counselors and unlicensed staff in particular "must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines." Id. § 429.424(F).

Satellite programs are subject to additional regulations regarding staff supervision and integration with parent centers; MassHealth payment for rendered services is conditioned on the satellites' compliance with these provisions. Id. § 429.439. As Arbour's Lawrence clinic is a satellite of a parent center located in Malden, Relators' claims are largely premised on a failure to conform to the strictures of the satellite-specific regulation.

B. Facts relevant to Relators' claims against UHS

Relators' daughter, Yarushka Rivera[4] — a teenage recipient of MassHealth benefits — began seeing Arbour counselor Maria Pereyra in 2007 after experiencing behavioral problems at school. Pereyra, though on staff at Arbour, had no professional license to provide mental-health therapy. Relators met with Pereyra's supervisor, clinical director Edward Keohan, after

_____

[4] Yarushka Rivera was the daughter of Relator Carmen Correa and the stepdaughter of Relator Julio Escobar.

Yarushka complained that she was not benefiting from counseling. During the meeting, Relators became concerned that Keohan was not supervising Pereyra and was unfamiliar with Yarushka's treatment.

Yarushka was eventually transferred to another staff member, Diana Casado, also ostensibly supervised by Keohan. Like Pereyra, Casado was unlicensed. Relators quickly became unsatisfied with her treatment of their daughter and believed that Casado was not being properly supervised.

In February 2009, Yarushka was once again assigned to a new therapist, Anna Fuchu. Fuchu held herself out as a psychologist with a Ph.D., though Relators later learned that she had trained at an unaccredited online school and that her application for a professional license had been rejected. Notwithstanding Fuchu's lack of essential credentials, she treated Yarushka and eventually diagnosed her with bipolar disorder.

Several months later, when Yarushka's behavioral problems had not abated, officials at her school informed Relators that she would be permitted to attend classes only if she saw a psychiatrist. When Relators told this to Fuchu, she referred Yarushka to Maribel Ortiz, another staff member at Arbour. Believing Ortiz to be a psychiatrist, Relators referred to her as "Dr. Ortiz." They eventually discovered, however, that she was not a psychiatrist, but rather a nurse, and that she was not under the supervision of the one Arbour staff psychiatrist, Maria Gaticales

— herself not board-certified, or eligible for board certification, as contemplated by the regulations. See 130 Mass. Code Regs. § 429.424(A)(1). Nonetheless, on May 6, 2009, Ortiz prescribed a medication called Trileptal for Yarushka's purported bipolar disorder.

Yarushka soon experienced an adverse reaction to the drug. Although she called Ortiz for guidance, her two phone messages went unreturned. When her condition worsened, Yarushka decided to discontinue the medication, having not heard from anyone at Arbour in several days. On May 13, Yarushka had a seizure and was hospitalized.

In the days following Yarushka's seizure, Relators spoke with Keohan and voiced their dissatisfaction with their daughter's care. Yarushka's stepfather Julio Escobar "began to suspect that no-one at Arbour was supervising Ms. Ortiz when Mr. Keohan claimed to have no knowledge of the Relators [sic] repeated efforts to reach Ms. Ortiz, and of Yarushka's recent seizure." After their conversation, Keohan directed the staff psychiatrist Gaticales to supervise Ortiz. Yarushka resumed treatment at Arbour, but suffered another seizure in October 2009, this one fatal.

After Yarushka's death, Relators spoke with Anna Cabacoff, a social worker at Arbour who had worked with Yarushka in the past. Cabacoff informed them that the counselors who had cared for Yarushka were not properly licensed to provide treatment

without supervision or to prescribe medication, and that Gaticales was not board-certified[5] and accordingly unqualified to supervise the other staff members.

In the months following the death of their daughter, Relators filed complaints with several state agencies, including the Disabled Persons Protection Committee ("DPPC"), Division of Professional Licensure ("DPL"), and the Department of Public Health ("DPH"). Although the ensuing DPPC report found that there was insufficient evidence of abuse of a disabled person, it concluded that Ortiz and Gaticales "may have been" out of compliance with relevant requirements concerning qualifications and supervision.

DPH determined, after an investigation, that Arbour had violated fourteen distinct regulations, including those relating to staff supervision and licensure.[6] The DPH report deemed Relators' allegations "valid" and found that

> [t]he Psychiatrist's personnel record indicated that she was not qualified to supervise a nurse practitioner because she was not Board Certified in psychiatry. Clinical Therapist #8's and Clinical Therapist #11's personnel files indicated they were not licensed. Clinic Director #2 said that he supervised Clinical Therapist #8 and Clinical Therapist #11, but did not document these meetings.

---

[5] Relators confirmed this by checking state licensing databases.

[6] Relators attached a copy of the DPH report to their complaint as an exhibit.

-8-

The report also concluded, based on a comprehensive review of Arbour's personnel files, that "23 therapists were not licensed for independent practice and also . . . were not licensed in their discipline."  Though all twenty-three therapists required clinical supervision, there was no documentation to show that any had received such supervision prior to January 2012, despite having been hired as early as 1996.  As a result of the DPH report, Arbour entered into a plan of correction with the agency to rectify the identified deficiencies.

In addition, Arbour's clinical director Keohan entered into a consent agreement with the Board of Registration of Social Workers, within the DPL.[7]  In the agreement, Keohan admitted to sufficient facts meriting the Board's conclusion that, inter alia, he had authorized Pereyra's unlicensed practice of social work at the clinic, in violation of Massachusetts law.  As a consequence, the agreement imposed a two-year period of supervised probation on Keohan's license to practice social work in the state.  Fuchu, another staff member who had treated Yarushka, also entered into a consent agreement wherein she admitted to holding herself out as a psychologist despite not being licensed.  She agreed to pay a $1,000 civil penalty.

---

[7] A copy of this agreement was attached to the complaint as an exhibit.

C.  Procedural background

Relators filed their second amended complaint in February of 2013, reciting the above allegations and setting forth fourteen counts against Defendant UHS under both the federal and Massachusetts False Claims Acts.[8]  The complaint alleged that Arbour, in submitting bills for services rendered by Pereyra, Casado, Fuchu, and Ortiz — in connection with the treatment of Yarushka Rivera and other MassHealth recipients — fraudulently misrepresented that those staff members were properly licensed and/or supervised, as required by law.  The complaint further alleged that Arbour made similar fraudulent misrepresentations with regard to additional unidentified clinical staff members and nurse practitioners, who had treated patients other than Yarushka.  Finally, Relators alleged that Arbour had engaged in fraudulent billing "during [a] period of non-compliance with core staff and supervision requirements," insofar as the clinic had failed to employ at least one fully certified psychiatrist and one fully certified psychologist.

The district court dismissed the complaint in its entirety.  In determining whether Relators had pleaded the requisite element of falsity, the court drew a distinction between

_____

[8] The federal and state governments declined to intervene on behalf of Relators in the district court, but the Commonwealth of Massachusetts as amicus curiae was permitted to participate in oral argument before this court.

requirements that MassHealth imposes on providers as preconditions to reimbursement ("conditions of payment") and those imposed as preconditions to participation in the program in the first instance ("conditions of participation"). The court held that only noncompliance with the former could establish the falsity of a claim. Relying on chapter 429's preamble, which states in part that "130 CMR 429.000 establishes requirements for participation of mental health centers in MassHealth,"[9] the court observed that the chapter "generally does not establish preconditions to payment." United States ex rel. Escobar v. Universal Health Servs., Inc., No. 11-11170-DPW, 2014 WL 1271757, at *7 (D. Mass. Mar. 26, 2014). The court then evaluated the text of individual regulations cited in the complaint to determine whether they constituted conditions of participation or of payment. The court analyzed the regulations "through the lens" of the preamble, effectively assuming that each regulation imposed only a condition of participation, "unless its

_____

[9] The full text of the preamble is as follows:

> 130 CMR 429.000 establishes requirements for participation of mental health centers in MassHealth and governs mental health centers operated by freestanding clinics, satellite facilities of clinics, and identifiable units of clinics. All mental health centers participating in MassHealth must comply with the MassHealth regulations, including but not limited to MassHealth regulations set forth in 130 CMR 429.000 and 450.000: Administrative and Billing Regulations.

130 Mass. Code Regs. § 429.401.

'plain provisions' suggest[ed] that it is also a precondition of payment." Id.

Applying that rubric, the district court ruled that Relators' claims failed on the merits, since there was "no indication" in the text of any of the pertinent regulations that they were intended as conditions of payment, rather than as conditions of participation as stated in the preamble. Id. at *7-8. The only exception was the overarching regulation pertaining to satellite centers — section 429.439 — which states that "[s]ervices provided by a satellite program are reimbursable only if the program meets the standards described below." See id. at *9. The court went on to note that section 429.439 sets forth different requirements for autonomous and dependent satellite programs; because Relators had failed to plead whether the Lawrence Arbour clinic was autonomous or dependent, the court held that the complaint did not plead with particularity a misrepresentation of compliance with any condition of payment, as required by Federal Rule of Civil Procedure 9(b). Id. at *10, *12. The court also held that the counts of the complaint directed at unnamed staff members and Arbour's pattern of noncompliance with core staffing requirements also failed to allege fraud with particularity. Id. at *12-13.

Relators now appeal from the dismissal of their complaint.

## II.  Analysis

A.  <u>False Claims Act generally</u>

The False Claims Act ("FCA" or "Act") is an "expansive[]" statute, intended "to reach all types of fraud, without qualification, that might result in financial loss to the Government."  <u>Cook Cnty., Ill.</u> v. <u>United States ex rel. Chandler</u>, 538 U.S. 119, 129 (2003) (internal quotation marks omitted).  As relevant here, the Act proscribes "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."[10]  31 U.S.C. § 3729(a)(1)(A).  To be actionable, a false or fraudulent statement must be material to the government's decision to pay a claim.  <u>United States ex rel. Loughren</u> v. <u>Unum Grp.</u>, 613 F.3d 300, 307 (1st Cir. 2010).  The Act's qui tam provisions authorize private individuals to sue on behalf of the United States in order to recover monies alleged to have been defrauded from the government.  31 U.S.C. § 3730(b); <u>United States ex rel. Duxbury</u> v. <u>Ortho Biotech Prods., L.P.</u>, 719 F.3d 31, 33 (1st Cir. 2013).

In defining the notion of "falsity" under the FCA, which the statute itself does not do, a number of circuits have developed

_____

[10]  The statute provides that "the terms 'knowing' and 'knowingly' . . . mean that a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required.  <u>Id.</u> § 3729(b)(1)(B).

two categories of false submissions: those that are factually false and those that are legally false. See, e.g., United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008); Mikes v. Straus, 274 F.3d 687, 696-97 (2d Cir. 2001). Courts have further subdivided claims in the latter group based on whether they proceed on a theory of either "implied" or "express" certification of compliance with conditions of payment. See United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305-06 (3d Cir. 2011) (collecting cases).

This circuit recently has eschewed distinctions between factually and legally false claims, and those between implied and express certification theories, reasoning that they "create artificial barriers that obscure and distort [the statute's] requirements." United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 385 (1st Cir. 2011). Instead, "we take a broad view of what may constitute a false or fraudulent statement to avoid 'foreclos[ing] FCA liability in situations that Congress intended to fall within the Act's scope.'" United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 85 (1st Cir. 2012) (alteration in original) (quoting Hutcheson, 647 F.3d at 387). We ask simply whether the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment. New York v. Amgen Inc., 652 F.3d 103, 110 (1st Cir. 2011). Preconditions of payment, which may be found in

-14-

sources such as statutes, regulations, and contracts, need not be "expressly designated." Hutcheson, 647 F.3d at 387–88. Rather, the question whether a given requirement constitutes a precondition to payment is a "fact-intensive and context-specific inquiry," Amgen, 652 F.3d at 111, involving a close reading of the foundational documents, or statutes and regulations, at issue. Cf. United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1269 (D.C. Cir. 2010) [hereinafter "SAIC"] ("The existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not . . . a necessary condition.").[11]

B. Establishing "falsity"

The district court — whose decision we review de novo, Amgen, 652 F.3d at 109 — acknowledged our rejection in Hutcheson of "judicially created formal categories," 647 F.3d at 385, but held that the distinction between conditions of participation and conditions of payment nonetheless survived; only misrepresentation of compliance with the latter would establish that a claim was false within the meaning of the FCA. The court reasoned that, because the holdings of both decisions were framed in terms of

_____

[11] But see, e.g., Mikes v. Straus, 274 F.3d 687, 700 (2d Cir. 2001) (FCA claim proceeding under theory that defendant misrepresented compliance with program requirement "is appropriate[] . . . only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid").

-15-

conditions of payment, Hutcheson and the subsequent case of Amgen at least implicitly accepted the "condition of payment/condition of participation dichotomy." Escobar, 2014 WL 1271757, at *6; see Amgen, 652 F.3d at 110 ("To survive [a] 12(b)(6) motion, [plaintiffs] . . . . must show that the claims at issue in [the] litigation misrepresented compliance with a material precondition of Medicaid payment such that they were false or fraudulent."); Hutcheson, 647 F.3d at 379 ("[W]e hold that [the] complaint, in alleging that the hospital and physician claims represented compliance with a material condition of payment that was not in fact met, states a claim under the FCA . . . ."). The court also pointed to cases from other circuits that have adopted such a framework. Escobar, 2014 WL 1271757, at *6 n.1 (citing cases from Second and Sixth Circuits).

To be sure, Hutcheson and Amgen held that a plaintiff states a claim under the FCA when he or she alleges that a recipient of government funds has misrepresented its compliance with a condition of payment. But while the district court concluded that only claims premised on misrepresentation of compliance with a condition of payment are cognizable under the FCA, we find that any payment/participation distinction is not relevant here. As in Amgen, the provisions at issue in this case clearly impose conditions of payment.

-16-

Section 429.439 of the MassHealth regulations expressly provides that "[s]ervices provided by a satellite program are reimbursable only if the program meets the standards described below [in subsections (A) through (D)]." Subsection (A) pertains to parent centers' supervision of satellite programs, while subsection (B) addresses the supervision that must occur <u>within</u> autonomous satellites, which "must provide supervision and in-service training to all noncore staff employed at the satellite program."[12] Subsection (C) further demands that all satellites employ a full-time clinical director who meets the qualifications required of core staff members in his or her discipline, as set forth in section 429.424; in addition, supervisors at dependent satellites must "receive regular supervision and consultation from qualified core staff at the parent center."

Relying on subsection (B), the district court read section 429.439 as imposing internal supervision requirements <u>only</u> on autonomous satellites. In so doing, the district court overlooked a critical interaction between section 429.439 and other substantive provisions of the MassHealth regulations: subsection (C) specifies that the clinical director of both autonomous and dependent satellites must "meet all of the requirements in 130 CMR

---

[12] 130 Mass. Code Regs. § 429.402 defines a "core team" as a "group of three or more mental-health professionals that must include a psychiatrist and one each of at least two of the following professionals: clinical or counseling psychologist, psychiatric social worker, or psychiatric nurse."

-17-

429.423(B)." Section 429.423(B), in turn, delineates the clinical director's responsibilities, including, inter alia, "overall supervision of staff performance."

Therefore, the MassHealth regulations explicitly condition the reimbursement of satellites' claims on the clinical director's fulfillment of his or her regulatory duties, regardless of whether the satellite is autonomous or dependent. Section 429.423(B) makes plain that one of those duties is ensuring appropriate supervision. Indeed, the cost of staff supervision is automatically built into MassHealth reimbursement rates. See 130 Mass. Code Regs. § 429.408(C)(3). That supervision at Arbour was either grossly inadequate or entirely lacking is the core of Relators' complaint. Insofar as Relators have alleged noncompliance with regulations pertaining to supervision, they have provided sufficient allegations of falsity to survive a motion to dismiss.

C. Application to Relators' complaint

1. Counts I-IV and VIII-XI

In Counts I through IV and VIII through XI,[13] Relators allege that four different individuals who treated Yarushka Rivera

---

[13] Counts VIII through XI are the same as Counts I through IV, but they bring claims under the Massachusetts FCA rather than the federal statute. "Given the substantive similarity of the [Massachusetts] FCA[] . . . and the federal FCA with respect to the provisions at issue in this litigation, the state statute[] may be construed consistently with the federal act." See New York v. Amgen, Inc., 652 F.3d 103, 109 & n.6 (1st Cir. 2011); Scannell v. Att'y Gen., 70 Mass. App. Ct. 46, 49 n.4 (2007) ("[T]he MFCA was modeled on the similarly worded Federal False Claims Act.").

(Pereyra, Casado, Fuchu, and Ortiz) did not receive proper supervision, either directly from the clinical director Keohan or from the psychiatrist Gaticales — who, in any event, was not board-certified. See 130 Mass. Code Regs. §§ 429.423(D), 429.424(A), 429.424(F), 429.438(E). In these counts, Relators have adequately pleaded that Arbour's claims for reimbursement in connection with Yarushka's treatment were false within the meaning of the Act, in that they misrepresented compliance with a condition of payment, i.e., proper supervision.[14]

These counts also have properly pleaded that the condition of payment at issue was a material one. The express and absolute language of the regulation in question "'constitute[s] dispositive evidence of materiality.'" Hutcheson, 647 F.3d at 394 (quoting SAIC, 626 F.3d at 1269); see 130 Mass. Code Regs. § 429.439 ("Services provided by a satellite program are reimbursable only if the program meets the standards described below.")

Furthermore, Relators have satisfied the scienter requirement, as they have plausibly pleaded that Arbour knowingly

_____

[14] Although the record is silent as to whether Arbour explicitly represented that it was in compliance with conditions of payment when it sought reimbursement from MassHealth, we have not required such "express certification" in order to state a claim under the FCA. See United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 385–86 (1st Cir. 2011) (rejecting labels of express and implied certification). We note, however, that each time it submitted a claim, Arbour implicitly communicated that it had conformed to the relevant program requirements, such that it was entitled to payment.

-19-

submitted false claims to MassHealth.  The complaint quotes a portion of Keohan's interview with the state DPH in which he admitted that, until recently, he was "unaware that supervision was required to be provided on a regular and ongoing bases, or that the supervision meetings needed to be documented."  These allegations more than suffice to establish that Arbour acted in reckless disregard or deliberate ignorance of the falsity of the information contained in the claims.  See  31 U.S.C. § 3729(b)(1)(A); cf. Loughren, 613 F.3d at 313–14.

These counts were pleaded with sufficient particularity. In the FCA context, Federal Rule of Civil Procedure 9(b) requires relators to connect allegations of fraud to particular false claims for payment, rather than a fraudulent scheme in the abstract. United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004).  While we have declined to set forth a mandatory checklist, we have identified a number of types of information that contribute to the particularity of the allegations, including:

> the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices.

Id. at 233.

-20-

Relators' complaint sets forth the core of this material: it alleges twenty-seven separate dates on which claims were submitted in connection with Yarushka's care, each time including the relevant billing codes, amount invoiced, and the name of the Arbour staff member who provided the treatment for which reimbursement was sought. Relators have thus succeeded in linking their allegations of fraud to specific claims for payment. Cf. United States ex rel. Ge v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 124 (1st Cir. 2013) (affirming dismissal of FCA complaint for failure to state fraud with particularity where relator "alleged next to no facts in support of the proposition that [pharmaceutical company's] alleged misconduct resulted in the submission of false claims or false statements material to government payment").

Finally, we note that while Relators' complaint provides specific information about bills submitted to MassHealth in connection with Yarushka's care only, it also seeks damages for bills submitted for services rendered to all MassHealth recipients by Pereyra, Casado, Fuchu, and Ortiz within a six-year period. Under the circumstances of this case, where Relators have raised a particular and plausible allegation of fraud in connection with the treatment of their daughter, we do not view the absence of more precise details pertaining to the bills for services provided to other MassHealth recipients as an impediment to proceeding. Given that such allegation is not particular to Yarushka's treatment, but

-21-

rather arises from the clinical director's systematic failure to enforce supervision requirements, it stands to reason that billing for more than one MassHealth recipient has been infected by fraud.

    2.   <u>Counts VII and XIV</u>

For similar reasons, Counts VII and XIV of Relators' complaint also survive a motion to dismiss.  The substance of those counts is that Arbour violated both the federal and Massachusetts FCA by fraudulently misrepresenting its compliance with regulations requiring mental-health clinics to employ at least one board-certified psychiatrist at all times.[15]  <u>See</u> 130 Mass. Code Regs.

---

[15] At different points in their complaint, Relators identify both MassHealth and Department of Public Health ("DPH") regulations as the source of this staffing requirement.  There is at least some ambiguity as to whether the MassHealth regulation in question, 130 Mass. Code Regs. § 429.422, independently requires each satellite clinic to employ its own psychiatrist.  Section 429.422 provides that <u>mental health centers</u> must employ at least one psychiatrist. A "mental health center" is defined as "an entity that delivers a comprehensive group of diagnostic and psychotherapeutic treatment services to mentally or emotionally disturbed persons and their families by an interdisciplinary team under the medical direction of a psychiatrist."  130 Mass. Code Regs. § 429.402.  This definition appears to refer to an entity comprising <u>both</u> the parent center and the satellite locations.  <u>See</u> 130 Mass. Code Regs. § 429.402 (defining "parent center" as "the central location of the <u>mental health center</u> . . . ."; defining "autonomous satellite program" and "dependent satellite program" as "a <u>mental health center</u> program . . . .") (emphases added).  On this reading of the definition of "mental health center," a satellite that does not employ a psychiatrist is not out of compliance with the staffing regulation so long as the parent has a psychiatrist on staff.
But the DPH regulations suggest something else.  105 Mass. Code Regs. § 140.530 provides that every "clinic providing mental health services" must employ a board-certified psychiatrist, or one who is eligible for board certification.  "A satellite clinic must meet [this requirement] independently of its parent clinic."  105 Mass. Code Regs. § 140.330.  According to the DPH report attached

-22-

§ 429.422(A); 105 Mass. Code Regs. § 140.530(C)(1)(a). Since the clinical director is explicitly responsible for hiring adequate psychiatric staff, see 130 Mass. Code Regs. § 429.423(B)(2)(e), and claims are reimbursable only if the clinical director fulfills the assigned duties, see id. § 429.439(C), Arbour's failure to maintain a properly licensed psychiatrist on staff constituted noncompliance with a material condition of payment. Such noncompliance was at least deliberately ignorant, in light of Relators' allegation that they were able to determine that Gaticales was not board-certified in psychiatry simply by checking a state licensing database. Thus, these counts, too, were improperly dismissed.[16]

_____

to Relators' complaint, which details the results of the agency's investigation of the satellite clinic where Yarushka Rivera received treatment, that clinic was not in compliance with the staffing requirements of 105 Mass. Code Regs. § 140.530. We defer to the agency's determination that such regulation applies to the Arbour satellite clinic at issue here. See City of Pittsfield, Mass. v. U.S. Envt'l Prot. Agency, 614 F.3d 7, 10-11 (1st Cir. 2010) (giving "controlling weight" to "agency's interpretation [of its own regulation] unless it is plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted); Friends & Fishers of Edgartown Great Pond, Inc. v. Dep't of Envt'l Prot., 446 Mass. 830, 838 (2006) (deferring to agency's interpretation of its own regulations).

    [16] These counts also allege that Arbour violated core staffing requirements by failing to have at least one licensed psychologist on staff. However, the regulations do not mandate that a psychologist be on staff at all times; instead, clinics are required to employ at least two people from various disciplines, one of which is psychology. 130 Mass. Code Regs. § 429.422(A); 105 Mass. Code Regs. § 140.530(C)(2)(b).
    Although Fuchu held herself out as a licensed psychologist when she in fact was not, the complaint does not allege whether Arbour retained any other properly licensed psychologists, or staff in other approved disciplines. Thus, the portions of Counts VII

-23-

3.  Counts V-VI and XII-XIII

We are left with Counts V, VI, XII, and XIII, which allege that Arbour engaged in fraudulent billing in connection with other unlicensed and unsupervised clinical staff and nurse practitioners. Relators allege that the "specific identit[ies]" of these staff members are "currently unknown to [them] but [are] well known to Arbour."

We have previously upheld the dismissal of claims under the FCA for failure to plead fraud with particularity where, among other things, the individuals involved with allegedly improper billing were not identified. See, e.g., Karvelas, 360 F.3d at 233. Here, however, while the staff members in question have not been identified by name in the individual counts, the factual background of the complaint sets forth a non-exhaustive list of twenty-two Arbour employees who have obtained a National Provider Identification number despite not being licensed as social workers or mental-health counselors by the Commonwealth of Massachusetts. Moreover, the DPH report attached to the complaint verifies that twenty-three Arbour therapists "were not licensed for independent practice and also . . . were not licensed in their discipline," and had received no documented supervision prior to January 2012. These concrete allegations, corroborated by a state agency's

and XIV that allege that Arbour committed fraud by failing to have at least one licensed psychologist on staff does not state a plausible claim for relief.

-24-

independent report and Keohan's own admission that the clinic suffered from a fundamental lack of oversight, confirm that the basic goals of Federal Rule of Civil Procedure 9(b) have been met — "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a wrongdoing, and to protect a defendant against the institution of a strike suit." Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997) (internal quotation marks omitted); cf. Ge, 737 F.3d at 123 (observing that particularity requirement of Rule 9(b) is designed to ward off "parasitic relators who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover" (internal quotation marks omitted)). Under the circumstances, then, these counts of Relators' complaint also state claims under the FCA.

### III. Conclusion

Compliance with the regulations at issue pertaining to staff supervision and core staffing at satellite centers is a condition of payment by MassHealth. Because our case law makes clear that a healthcare provider's noncompliance with conditions of payment is sufficient to establish the falsity of a claim for reimbursement, we need not address here whether the False Claims Act embraces a distinction between conditions of payment and conditions of participation.

In the final analysis, Relators' daughter died after receiving treatment that was out of compliance with over a dozen

regulations, as determined by an independent report.  Relators have carefully compiled information regarding the names of unlicensed and unsupervised providers, and the dates, amounts, and codes of allegedly false claims submitted to MassHealth.  As such, they have appropriately stated a claim with particularity under the FCA.

We accordingly REVERSE the dismissal of Relators' complaint, save for that portion of Counts VII and XIV pertaining to the employment of psychologists.  See supra note 16.  We remand the case for proceedings consistent with this opinion.  Costs are awarded to Relators.