# United States Court of Appeals
## For the First Circuit

No. 21-1781

AMYNDAS PHARMACEUTICALS, S.A. and AMYNDAS PHARMACEUTICALS, LLC,

Plaintiffs, Appellants,

v.

ZEALAND PHARMA A/S and ZEALAND PHARMA U.S., INC.,

Defendants, Appellees,

ALEXION PHARMACEUTICALS, INC.,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

---

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

---

Robert E. Counihan, with whom David K. Tellekson, Jessica M. Kaempf, Deena J. Greenberg Feit, Todd R. Gregorian, Fenwick & West LLP, Russell Beck, and Beck Reed Riden LLP were on brief, for appellants.

Edwina Clarke, with whom Kevin P. Martin, Robert D. Carroll, Huiya Wu, Tiffany Mahmood, and Goodwin Procter LLP were on brief, for appellees.

September 2, 2022

**SELYA**, **Circuit Judge**.  When biotech firms engage in the entrepreneurial equivalent of musical chairs, one firm sometimes gets left out in the cold.  That is essentially what happened here — and it led to the litigation described below.

The music began with serial decisions by plaintiffs Amyndas Pharmaceuticals, S.A., now known as Amyndas Pharmaceuticals Single Member P.C., and Amyndas Pharmaceuticals, LLC (collectively, Amyndas), appellants here, to consider separate joint ventures with defendants Zealand Pharma A/S (Zealand Pharma) and Alexion Pharmaceuticals, Inc. (Alexion), respectively.  In the ensuing chorus of negotiations, Amyndas relied on confidential disclosure agreements (CDAs) to safeguard its trade secrets.  After Amyndas shared that confidential information, though, neither of the joint ventures materialized.

Even so, the band played on.  Zealand Pharma and its newly established affiliate, Zealand Pharma U.S., Inc. (Zealand US), announced a partnership with Alexion — a partnership that contemplated bringing to market a drug targeting the same part of the immune system on which Amyndas had been concentrating.  Amyndas responded by suing for misappropriation of trade secrets and other confidential information.

The district court dismissed Amyndas's claims against Zealand Pharma on the ground that the CDA between the parties required Amyndas to litigate those claims in Denmark.  See Amyndas

- 3 -

Pharms., S.A. v. Alexion Pharm., Inc., No. 20-12254, 2021 WL 4551433, at *7 (D. Mass. June 8, 2021). It then dismissed Amyndas's claims against Zealand US for failure to state a claim because the complaint's allegations were predominately against the Zealand entities, collectively, and thus "[we]re insufficient to put [the Zealand entities] on notice as to 'who did what to whom.'" Id. at *2. Twenty-eight days later, Amyndas filed a motion for reconsideration or, in the alternative, for leave to amend, attaching a proposed amended complaint. The district court denied both reconsideration and leave to amend.

Amyndas appealed these rulings. Because Amyndas's claims against Alexion remained pending in the district court, the district court entered a partial final judgment under Federal Rule of Civil Procedure 54(b) to enable immediate appellate review. Following briefing and oral argument, we now uphold the entry of a partial final judgment under Rule 54(b). And having confirmed the existence of appellate jurisdiction, we affirm the dismissal of Amyndas's claims against Zealand Pharma, vacate the dismissal of Amyndas's claims against Zealand US, and remand to the district court for further proceedings consistent with this opinion.

**I**

We briefly rehearse the facts and travel of the case. In that account, we take as true all well-pleaded facts alleged in the proposed amended complaint, drawing all reasonable inferences

- 4 -

in the pleader's favor. See Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 52-53 (1st Cir. 2013); Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012).

Amyndas consists of a Greek company and its American affiliate. It is a biotechnology firm that researches and develops therapeutics targeting a part of the immune system known as the complement system. When the complement system malfunctions, it can cause the immune system to attack healthy tissue, either causing or exacerbating a wide variety of conditions. One area of Amyndas's research deals with "complement inhibitors."

Amyndas's research has yielded compstatin — a peptide that selectively inhibits the C3 protein (which plays a role in activating the complement system). What is more, Amyndas also has developed a related peptide (AMY-101) targeting that protein for clinical use. Amyndas is the exclusive licensee of patents related to this work and has endeavored to develop therapies based on AMY-101 that target the C3 protein. It owns trade secrets and confidential information related to this work.

In March of 2015, Zealand Pharma, a Danish biotechnology firm, contacted Amyndas about a potential partnership for the development of complement-related therapeutics. Discussions ensued. The next month, the two firms entered into a CDA regarding information-sharing "for the purposes of evaluating a possible business/ services relationship between the parties and their

- 5 -

respective Affiliates." Shortly thereafter, Amyndas started giving Zealand Pharma access to confidential information (including confidential information about AMY-101). In August of 2016, the firms signed a second CDA — with added protections — for "the evaluation or formation of a possible business and/or services and/or collaborative relationship."

Both CDAs contained elaborate confidentiality provisions. The confidentiality provision of the second CDA is emblematic. It stated that the recipient of confidential information:

> shall (a) make no use of any of the Confidential Information disclosed by Discloser other than for the Purpose [of the evaluation or formation of a possible business and/or services and/or collaborative relationship between the parties and their respective Affiliates], (b) not disclose such Confidential Information to third parties, and (c) take all reasonable precautions to prevent disclosure of such Confidential Information to third parties.

The confidentiality provision further stated that the recipient of confidential information:

> may only provide the Confidential Information of Discloser to its Representatives and its Affiliates who (a) need it for the Purpose, (b) are informed of the confidential nature of the Confidential Information, and (c) are bound by obligations of confidentiality and non-use no less restrictive than those contained herein.

The second CDA also contained an explicit guarantee that Amyndas would "own all the Developed Technology incorporating, or involving the use of, the Amyndas Base Technology."

Both CDAs included an identical "Governing Law" provision. This provision consisted of a choice-of-law clause stipulating that the CDAs would "be interpreted and governed by the laws of the country (applicable state) in which the defendant resides" and a forum-selection clause stipulating that "any dispute arising out of th[e CDA] shall be settled in the first instance by the venue of the defendant."

Following the execution of the second CDA, Amyndas shared more proprietary information with Zealand Pharma. Meanwhile, Zealand Pharma began its own research program in late 2016, also focused on complement therapeutics. It did not inform Amyndas of this initiative. Although negotiations continued, the firms ultimately decided not to collaborate. On April 26, 2017, Amyndas terminated its information-sharing relationship with Zealand Pharma.

We fast-forward to August of 2018, at which time Zealand Pharma formed Zealand US, a Delaware corporation having its principal place of business in Boston, Massachusetts. Without Amyndas's knowledge or consent, Zealand Pharma filed two European patent applications in 2018. Zealand Pharma then filed an international patent application in February of 2019, claiming

priority in the two earlier patent applications and designating the United States as one jurisdiction in which patent protection would be sought.

On September 6, 2019, the international patent application was published, thus making its contents publicly available for the first time. The application purported to describe "compstatin analogues that are capable of binding to C3 protein and inhibiting complement activation." The C3 protein — which is the target of AMY-101 — has been the focus of Amyndas's research for many years. Perhaps more importantly, it was one subject of Amyndas's information-sharing with Zealand Pharma. Amyndas alleges that it shared confidential information with Zealand Pharma under the CDAs — information about various features, profiles, and characteristics of AMY-101 as well as how it could be used to make next-generation compounds.

At this juncture, it is useful to describe Alexion's role in this saga of alleged corporate intrigue. In 2007, Alexion — an established player in the complement therapeutics field — brought to market Soliris, a complement inhibitor that targets the C5 protein (a protein in the complement system). Soliris has been approved by the Food and Drug Administration (FDA) for four indications and — until recently — Soliris was the only FDA-approved and clinically available complement-specific therapeutic on the market. Alexion's patent on Soliris expires soon, and

Alexion is facing commercial pressure to bring new complement-based drugs to market.

In January of 2018, representatives of Alexion and Amyndas met in San Francisco. Following that meeting, Alexion expressed interest in forming a partnership with Amyndas. The two companies signed a CDA limiting the use of exchanged confidential information to a singular purpose, namely, the "exploration of one or more potential business arrangements and/or potential arrangements of research, development, and commercialization of drug candidates relating to Amyndas' complement inhibitors." Alexion requested and received certain confidential information about Amyndas's complement therapeutic research, including details about Amyndas's intellectual property, planned clinical trials, platform, and collaboration network.

Although Alexion and Amyndas continued to talk for some time, their partnership negotiations ran aground. But through at least December of 2018, Alexion continued to receive confidential research updates from Amyndas. Unbeknownst to Amyndas, Alexion and Zealand Pharma had been discussing a collaboration during the same time frame. On March 20, 2019, those two firms issued a joint press release announcing a joint venture to develop complement therapeutics. More recently, they have announced that they anticipate entering Phase I clinical trials with a complement inhibitor targeting the C3 protein in the complement system.

Amyndas came to suspect that Alexion and Zealand Pharma had misappropriated confidential information which Amyndas had shared pursuant to the CDAs. The announced collaboration between Alexion and Zealand Pharma for drugs targeting the C3 protein heightened these suspicions. Deeming its rights infringed, Amyndas sued Zealand Pharma, Zealand US, and Alexion in the United States District Court for the District of Massachusetts. Its complaint alleged that the Zealand defendants breached the CDAs, misappropriated trade secrets and other confidential information, and conspired with Alexion to use those misappropriated materials in producing competing complement therapeutic products. Specifically, the complaint alleged claims against the Zealand defendants for trade secret misappropriation, unfair competition, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. So, too, the complaint alleged claims against Alexion for trade secret misappropriation, tortious interference with contractual relations, unfair competition, breach of contract, and unjust enrichment. The complaint then tied all the defendants together by asserting conspiracy claims.

Alexion answered the complaint, but the Zealand defendants moved to dismiss. On June 8, 2021, the district court dismissed Amyndas's claims against both Zealand defendants. See Amyndas, 2021 WL 4551433, at *7. As to Zealand Pharma, the court

- 10 -

ruled that the forum-selection clause in the CDAs required that all claims against that defendant be brought in Denmark. See id. at *4-6. Looking to the plain meaning of the phrase "shall be settled in the first instance by the venue of the defendant," the court concluded that the "only plausible reading" of the forum-selection clause was that "adjudication of claims against a party defendant that arise out of the CDA must occur in the location of the party defendant." Id. at *4. As to Zealand US (which had not itself executed a CDA with Amyndas), the court ruled that the complaint failed to state a claim upon which relief could be granted. See id. at *3. The court noted that the complaint largely referred to "Zealand" as a single entity and did not make clear whether and how Zealand US was involved. See id. at *2-3. And because Zealand US was not formed until August of 2018, the "claims stated against 'Zealand' as a combined entity [we]re not sufficient to put Defendants on notice as to which claims pertain to Zealand [US]." Id. at *3.

Twenty-eight days later, Amyndas moved for reconsideration or, in the alternative, leave to amend the complaint. In its proposed amended complaint, Amyndas carefully distinguished between the two Zealand entities and pleaded its claims against them as discrete counts. Furthermore, the proposed amended complaint alleged additional facts supporting the claim that Zealand US was involved in the continuing exploitation of

- 11 -

Amyndas's trade secrets, including allegations that Zealand US bears ongoing responsibility for the Alexion partnership and is participating in efforts to obtain regulatory approval for therapeutics derived from Amyndas's trade secrets. The proposed amended complaint also alleged that Zealand US is a corporate alter ego of Zealand Pharma and that the two are operated as a single business.

On August 27, 2021, the district court denied Amyndas's motion. In a minute order, the court summarily refused reconsideration and denied Amyndas's request to file an amended complaint. The court indicated that the proposed amended complaint would be futile — but undertook no analysis of any specific allegations against Zealand US. Instead, it tersely stated that the "proposed additional factual allegations" did not "plausibly allege a basis to conclude either that the Court should disregard the Zealand defendants' separate legal identities, or that Amyndas has stated claims directly against Zealand US."

Amyndas appealed. In conjunction with its notice of appeal, Amyndas moved for entry of a partial final judgment. See Fed. R. Civ. P. 54(b). Zealand Pharma and Zealand US opposed the Rule 54(b) motion. The district court overruled the Zealand defendants' objections and entered a partial final judgment, thus breathing life into the notice of appeal. See Fed. R. App. P.

4(a)(2).  Briefing followed in due course, and we heard oral argument on June 8, 2022.

## II

Mindful that a federal court must always ensure that its rulings rest on a solid jurisdictional plinth, see Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 155-56 (1st Cir. 2004) ("When a colorable question exists, an appellate court has an unflagging obligation to inquire sua sponte into its own jurisdiction."), we start by considering the basis for our jurisdiction over this interlocutory appeal:  the district court's entry of partial final judgment under Rule 54(b).  A federal appellate court's jurisdiction over an appeal is ordinarily limited to "final decisions" of the district court.  28 U.S.C. § 1291.  This finality principle typically requires a final disposition of all claims in an action that have been brought by or against all of the parties.  See Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980); Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003); see also Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 431-38 (1956).  But Federal Rule of Civil Procedure 54(b) carves out an exception:  it permits a district court to issue a partial final judgment that is immediately appealable as to particular claims or parties when those claims or parties can be sufficiently separated from other claims or parties in the case.

Withal, the district court's authority in this respect is narrowly circumscribed. Only if the court supportably determines both that its decision regarding a claim or party is sufficiently final and that "there is no just reason for delay[ing]" an immediate appeal may it enter a partial final judgment under Rule 54(b). See Fed. R. Civ. P. 54(b); see also Curtiss-Wright Corp., 446 U.S. at 7-8.

There is good reason why Rule 54(b) is narrowly circumscribed. The rule is designed to balance the need for the timely adjudication of important issues that arise early in a case with the "long-settled and prudential policy against the scattershot disposition of litigation." Spiegel v. Trs. of Tufts Coll., 843 F.2d 38, 42 (1st Cir. 1988). The entry of "[j]udgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." Id. (quoting Morrison-Knudsen Co. v. Archer, 655 F.2d 962, 965 (9th Cir. 1981) (Kennedy, J.)).

The court below determined that this case fit within the confines of Rule 54(b). It entered a partial final judgment dismissing Amyndas's claims against Zealand Pharma and dismissing Amyndas's claims against Zealand US. At the same time, it retained jurisdiction over Amyndas's claims against Alexion but stayed

further proceedings pending the disposition of Amyndas's anticipated appeal.

The Zealand defendants contend that the court erred in entering the partial final judgment. We review the district court's legal determination regarding finality de novo. See González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 317 (1st Cir. 2009). But we review the district court's determination that there is no just reason to delay the entry of judgment on the dismissal of the claims against the Zealand defendants for abuse of discretion. See id.

The finality requirement is satisfied as long as the "trial court action underlying the judgment disposed of all the rights and liabilities of at least one party as to at least one claim." Credit Francais Int'l, S.A. v. Bio-Vita, Ltd., 78 F.3d 698, 706 (1st Cir. 1996); see Curtiss-Wright, 446 U.S. at 7. Here, it is undisputed that the dismissal of Amyndas's claims against the Zealand defendants satisfies this standard. Moreover, that order is unarguably final. See Credit Francais, 78 F.3d at 706. The burden of our inquiry thus falls on whether there is any "just reason for delay." Fed. R. Civ. P. 54(b).

In mounting this inquiry, we must "scrutinize the district court's evaluation of such factors as the interrelationship of the claims so as to prevent piecemeal appeals in cases which should be reviewed only as single units." Curtiss-

- 15 -

<u>Wright</u>, 446 U.S. at 10.  For this purpose, the district court acts as a "dispatcher," determining which final decisions should await appeal in the ordinary course and which should be permitted to go forward immediately.  <u>See</u> <u>id.</u> at 8.  If the district court considers the appropriate factors and adequately explains its reasoning, its determination is given "substantial deference."  <u>See</u> <u>Spiegel</u>, 843 F.2d at 44 (quoting <u>Pahlavi</u> v. <u>Palandjian</u>, 744 F.2d 902, 904 n.5 (1st Cir. 1984)).  After all, the district court has a more intimate familiarity with the case, the parties, and the interrelationships among the claims.

The Zealand defendants submit that the district court undervalued the cost of piecemeal litigation and did not take proper account of Amyndas's ability to pursue its claims in Denmark.  Such considerations, however, are outweighed by the desirability of a single trial in a single forum — and we think that it was well within the ambit of the district court's discretion to facilitate an interlocutory appeal designed to test these waters.

Here, moreover, the issues on appeal are ripe for review and distinct from the merits of the claims remaining against Alexion.  An immediate resolution of those issues will determine whether a joint trial is feasible.

Of course, even when concerns about piecemeal litigation are at a minimum because there is little risk of competing and

overlapping judgments on merits issues — as is the case here — a party seeking entry of partial final judgment must establish a compelling reason for accelerated appellate review. See id. at 45-46. For instance, the party may show a "pressing, exceptional need for immediate appellate intervention, or grave injustice of the sort remediable only by allowing an appeal to be taken forthwith, or dire hardship of a unique kind." Id. The district court concluded that Amyndas had satisfied this requirement, and we think that this determination was comfortably within the court's discretion. Although Amyndas can pursue litigation against the Zealand defendants (or at least against Zealand Pharma) in Denmark, it would be shortsighted to underestimate the added expense, inconvenience, and other disadvantages of following that path. If the forum-selection clause does not require resort to that venue, the parties ought to know that fact sooner rather than later. Where, as here, the appropriate forum is in legitimate dispute and the consequences of forum selection are substantial, that circumstance weighs heavily in favor of accelerated review. Cf. Fed. Home Loan Bank of Bos. v. Moody's Corp., 821 F.3d 102, 107 n.3 (1st Cir. 2016) (approving partial final judgment aimed at allowing case to proceed in "appropriate venue"). And the nature of the rights at issue here — intellectual property rights that may erode in significance over time — also factors in favor of speedier review. Given this medley of factors, we find no abuse

of discretion in the district court's determination that there was no just reason for delay in entering a partial final judgment. Because the Rule 54(b) judgment covers all of the claims brought against the Zealand defendants, because the judgment as to those claims is final, and because the district court supportably determined that there was no just reason to delay the entry of that judgment, we have jurisdiction to hear and determine this appeal.

## III

We divide our analysis of the appealed rulings into two movements. First, we address the district court's dismissal of Amyndas's claims against Zealand Pharma by reason of the forum-selection clause. Second, we address the district court's denial of Amyndas's motion for leave to file an amended complaint against Zealand US. We then recapitulate our conclusions.

### A

We begin with the district court's dismissal of Amyndas's claims against Zealand Pharma. That dismissal was based upon the identical forum-selection clauses contained in the two CDAs.

As an initial matter, we note that Zealand Pharma properly raised the forum-selection issue. The Supreme Court has indicated that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine

- 18 -

of forum non conveniens." Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 60 (2013) (emphasis in original). Even so, the Atlantic Marine Court left the door open for considering forum-selection arguments under the aegis of Rule 12(b)(6). See id. at 61 & n.4. This court has typically analyzed forum-selection clauses under that framework. See, e.g., Rivera v. Kress Stores of P.R., Inc., 30 F.4th 98, 102 (1st Cir. 2022); Claudio-de León v. Sistema Universitario Ana G. Méndez, 775 F.3d 41, 46 & n.3 (1st Cir. 2014). The arguments posed by Zealand Pharma fit within these contours.

Against this backdrop, we train the lens of our inquiry upon the forum-selection clause. We first discuss the interpretation of that clause and then discuss its enforceability.

**1**

We review de novo an order of dismissal under Rule 12(b)(6). See Silva v. Encycl. Britannica Inc., 239 F.3d 385, 387 (1st Cir. 2001). As we have said, both CDAs between Amyndas and Zealand Pharma contained the same forum-selection provision[1]:

> Governing Law. For any claim brought against a party under this Agreement, the Agreement will be interpreted and governed by the laws of the country (applicable state) in which the defendant resides. If an amicable settlement cannot be reached, any dispute arising out of this Agreement shall be settled in the first instance by the venue of the defendant.

---

[1] Given the identicality of the two forum-selection clauses, we treat the two forum-selection clauses as one.

- 19 -

(second emphasis supplied). The district court concluded that "the only plausible reading of the forum selection clause . . . is that adjudication of claims against a party defendant that arise out of the CDA must occur in the location of the party defendant." Amyndas, 2021 WL 4551433, at *4. It further concluded that the "location" of Zealand Pharma was Denmark. See id. at *4-5. Inasmuch as all of Amyndas's claims against Zealand Pharma arose out of the CDAs, those claims had to "be litigated in Denmark." Id. at *4.

Before we reach the dispositive issue, two preliminary matters demand our attention. First, we think it important to remark that neither party quarrels with the district court's conclusion that Amyndas's claims against Zealand Pharma "aris[e] out of" the CDAs. Second, we also think it important to remark that the parties agree that the forum-selection clause in this case is mandatory. In other words, the clause specifies a forum in which claims must be brought (unless enforcement of the clause is either waived or impermissible). See Rivera, 30 F.4th at 103; Huffington v. T.C. Group, LLC, 637 F.3d 18, 21 (1st Cir. 2011).

Where, as here, a federal court is asked to enforce a forum-selection clause, federal common law supplies the rules of decision. See Rivera, 30 F.4th at 102-03; Lambert v. Kysar, 983 F.2d 1110, 1116 (1st Cir. 1993). Notwithstanding the choice-of-law clause contained in each CDA, the parties have agreed that

federal common law and general contract-law principles control here.

Under federal common law, a contract must be "read in accordance with its express terms and the plain meaning thereof." C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993). The contractual terms are accorded "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998); see Forcier v. Metro. Life Ins. Co., 469 F.3d 178, 185 (1st Cir. 2006) (noting that federal common law "requires that we accord [a contract's] unambiguous language its plain and ordinary meaning"); Smart v. Gillette Co. Long-Term Disab. Plan, 70 F.3d 173, 178 (1st Cir. 1995) (explaining that federal common law demands the application of "common-sense canons of contract interpretation"). Even so, an inquiring court must avoid tunnel vision: instead of focusing myopically on individual words, it must consider contractual provisions within the context of the contract as a whole. See Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 17 (1st Cir. 2009); Smart, 70 F.3d at 179.

Given the parties' consensus on these points, the interpretive question before us boils down to the meaning of the term "the venue of the defendant." Amyndas argues that "the venue of the defendant" denotes multiple locations as applied to Zealand Pharma — including locations where Zealand Pharma and its

- 21 -

affiliates have a presence (including both Denmark and Massachusetts). We do not believe that "the venue of the defendant" is susceptible to so elastic an interpretation.

"Venue" is a term that — in legal matters — has both a general meaning and a more specialized meaning. Amyndas contends that the meaning of "venue" in the forum-selection clause should closely track its specialized legal meaning. In particular, it draws sustenance from the federal venue statute, see 28 U.S.C. § 1391, which defines venue to include not only the place or places where a defendant resides (which — for corporations — can include multiple locations) but also the place or places where events or omissions giving rise to the claim occurred, see id. § 1391(b)-(d). Such a construction would inevitably lead to the conclusion that Zealand Pharma potentially could be sued in virtually any jurisdiction. But such a conclusion would undercut the certainty that forum-selection clauses are meant to confer and would render the clause largely superfluous. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 13 n.15, 17 (1972). So viewed, Amyndas's principal argument lacks force.

Nor does Amyndas's effort to tether Zealand Pharma to Zealand US gain Amyndas any traction with respect to its principal argument. After all, the two are separate corporations, and Zealand US did not exist when the CDAs were executed. Given that factual backdrop, we cannot credit Amyndas's argument that the

- 22 -

parties, as "sophisticated" entities, used the term "the venue of the defendant" to signify virtually any location.

Amyndas tries a variation on this theme — a variation that also relies heavily on treating Zealand Pharma as substantially equivalent to Zealand US. It suggests that even if "the venue of the defendant" is accorded the narrower but still widely shared meaning of "locale" or "location," see, e.g., Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/venue (defining "venue" as "locale"); Oxford English Dictionary, https://www.oed.com/view/Entry/222318 (defining "venue" with various sense of place, scene, and location), Zealand Pharma operates in multiple locales. Amyndas points to facts suggesting that Zealand Pharma operates hand-in-glove with Zealand US and argues that the locations of Zealand US's offices in Massachusetts and New York qualify as residences of Zealand Pharma.

But this argument ignores the distinction between Zealand Pharma and Zealand US. The forum-selection clause points unerringly to Zealand Pharma, not to Zealand US. Only the latter has a residence in the United States. This interpretation has the unparalleled benefit of being consistent with other aspects of the CDAs. See PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 17 (1st Cir. 2010) (explaining that "one of the cardinal rules of contract interpretation" is "that a document should be read to . . . render

[all its provisions] consistent with each other" (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995))). Take the choice-of-law clause, for instance. That clause sets the governing law as that of "the country (applicable state) in which the defendant resides." At the time the CDAs were signed, Zealand Pharma's residence could only have been Denmark. Thus, as applied to Zealand Pharma, "the country . . . in which [it] resides" could only have been understood to mean that singular location.

For this reason, we reject Amyndas's argument that the parties' use of the phrase "the country . . . in which the defendant resides" shows that they knew how to select the defendant's place of residence when they intended to do so. See, e.g., Vendura v. Boxer, 845 F.3d 477, 485 (1st Cir. 2017). Given Zealand Pharma's singular location at the times the CDAs were signed, we think it is more consistent with those agreements as a whole to interpret "the venue of the defendant" similarly to "country . . . in which the defendant resides." Simply stated, both "venue" and "residence" point to Denmark because that is Zealand Pharma's lone location.

We are not convinced of any contrary conclusion by Amyndas's argument regarding the parties' use of the definite article "the" before "venue" in the forum-selection clause. "[T]he definite article 'the' 'particularizes the subject spoken of,'

- 24 -

suggesting . . . refer[ence] to a single object." Hernandez v. Williams, Zinman & Parham PC, 829 F.3d 1068, 1074 (9th Cir. 2016) (quoting Black's Law Dictionary 1647 (4th ed. 1968)). Just as "the house" means that there is one house, so too "the venue," in this context, could mean that there is one venue.

To be sure, the force of "the" and the singular form depend on context and use. Amyndas points to the Dictionary Act, which provides that — so far as the construction of federal statutes is concerned — "words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. Relatedly, Amyndas notes that the federal venue statute, 28 U.S.C. § 1391, uses "the venue" even though "no single such location exists."

Assuming without deciding that Amyndas is correct that "the" could refer to multiple locations, that does not change the outcome of this case. That is because — as we already have stated — Zealand Pharma has had only one residence at all relevant times: Denmark. Consequently, it would be struthious to suggest that "the venue" of Zealand Pharma carried a plural meaning.

And in addition, our reading of the agreement accords with the core purpose of a mandatory forum-selection clause: to restrict the fora in which covered controversies may be resolved. That purpose was adequately evinced in this case, as the forum-selection clause was a "reasonable effort to bring vital certainty

to this international transaction." M/S Bremen, 407 U.S. at 17. The interest in creating certainty would be poorly served by construing "the venue of the defendant," as used in the CDAs, as referring to virtually anywhere. A mandatory forum-selection clause that permits suit to be brought virtually anywhere is not a mandatory forum-selection clause at all.

To say more on this point would be supererogatory. Considering the text, context, and function of the forum-selection clause, we agree with the district court that the forum-selection clause must be interpreted to require that the claims against Zealand Pharma be brought first in a Danish court.

**2**

Amyndas argues that even if the forum-selection clause requires — by textual interpretation — litigating its claims against Zealand Pharma in Denmark, it would be unreasonable to enforce that clause as written. The premise that underpins Amyndas's argument is sound: even if a forum-selection clause is mandatory and unambiguous — as this one is — a court may decline to enforce it if the resisting party can show that doing so would be "unreasonable." See M/S Bremen, 407 U.S. at 10; Claudio-De León, 775 F.3d at 48-49. Absent such a showing, a forum-selection clause is presumptively enforceable. See Claudio-De León, 775 F.3d at 48.

We have articulated four grounds for deeming a forum-selection clause to be unenforceable:  the clause derives from "fraud or overreaching"; enforcing the clause "would be unreasonable and unjust"; "proceedings in the contractual forum will be so gravely difficult and inconvenient that the party challenging the clause will for all practical purposes be deprived of his day in court"; and enforcing the clause would "contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Id. at 48-49 (internal quotation marks omitted); see M/S Bremen, 407 U.S. at 15.  In addition, public interest factors under the doctrine of forum non conveniens may sometimes provide support for rejecting enforcement of an otherwise valid forum-selection clause, but "those factors will rarely defeat" such a clause. Atl. Marine, 571 U.S. at 64; see Imamura v. Gen. Elec. Co., 957 F.3d 98, 107 (1st Cir. 2020) (noting that public interest factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty" (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6 (1981))).

- 27 -

Amyndas does not argue that the forum-selection clause is somehow tainted by fraud or overreaching. Instead, Amyndas strives to persuade us that forcing it to litigate in Denmark would be unreasonable and would effectively deprive it of its day in court. Specifically, it says that Denmark has more restrictive trade secret protections and imposes limitations on discovery not imposed by American courts, such as restrictions on the availability of internal corporate documents.

We are not persuaded. A showing that a litigant would be so inconvenienced by litigating in a designated forum that a forum-selection clause should be disregarded is a heavy lift. See In re Mercurio, 402 F.3d 62, 66 (1st Cir. 2005); cf. Piper Aircraft, 454 U.S. at 246-55 (holding that potential change in law cannot, by itself, fend off dismissal under forum non conveniens absent showing that new law is "clearly inadequate or unsatisfactory"). Amyndas has not come close to making that heavy lift in this instance.

When the CDAs were first negotiated and signed, Zealand Pharma was based in Denmark and Zealand US did not exist. It would have been obvious to Amyndas at that time that if it wound up suing Zealand Pharma, it would be obliged to do so in Denmark, using whatever trade secret protections and discovery procedures were available under Danish law. Put bluntly, the content and contours of Danish trade secret law and the potential limitations on

- 28 -

discovery were clearly foreseeable to Amyndas from the start.  See Atl. Marine, 571 U.S. at 64; M/S Bremen, 407 U.S. at 17-18.  Had Amyndas — a sophisticated party acting with the advice of learned counsel — been wary of litigating under those rules, it could have negotiated for a different forum or choice of law.  That Amyndas may now be suffering buyer's remorse about the forum to which it agreed is not a sufficient reason for denying enforcement of a valid forum-selection clause.  See Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1298 (3d Cir. 1996).

Nor can Amyndas credibly claim that it is being denied its day in court.  Foreign courts frequently have more limited discovery or stricter evidentiary regimes than federal courts, but that is rarely a basis for concluding that a party would be denied its day in court.  See, e.g., Robinson v. TCI/US W. Commc'ns Inc., 117 F.3d 900, 909 (5th Cir. 1997) (holding that more limited discovery available under English law does not bar application of forum non conveniens dismissal); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991) (observing that the fact that discovery "procedures [in arbitration] might not be as extensive as in the federal courts" does not render agreement to arbitrate invalid).  Mere differences in procedures or limitations on remedies, unless they effectively deprive the complaining party of any remedy at all, will not render a designated forum unreasonable.  See Iragorri v. Int'l Elevator,

Inc., 203 F.3d 8, 14 (1st Cir. 2000) (concluding that remedy limitations in Colombia did not render forum inadequate); see also Piper Aircraft, 454 U.S. at 255 (affirming forum non conveniens dismissal and holding that remedies available in Scottish courts were not "so clearly inadequate or unsatisfactory" that they were "no remedy at all"). So it is here: although litigating in Denmark may be inconvenient for Amyndas and may increase the cost of litigation, the record does not support its claim that it will be denied its day in court there.[2]

Amyndas next contends that public policy requires that litigation proceed in the United States in order to prosecute its trade secrets claims. Although the Defend Trade Secrets Act (DTSA) guarantees a federal forum for trade secret theft claims, see 18 U.S.C. § 1836, Amyndas presents no evidence — and we can discern none in the record — that the DTSA was meant to supersede the forum-selection decisions of sophisticated parties.[3] Amyndas is on solid ground in noting that the DTSA's text and legislative

---

[2] In point of fact, Amyndas began proceedings against Zealand Pharma in Denmark on January 10, 2022, and it has successfully obtained a stay of the contested patents from the European Patent Office.

[3] We add, moreover, that when the first CDA was signed in March of 2015, the DTSA had not yet been enacted. Although the second CDA was signed in August of 2016 (after the DTSA became effective in May of that year), it would be hard to believe — given the identical nature of the forum-selection clauses and the other similarities in the documents — that either of the parties structured their conduct around the existence of the DTSA.

history make pellucid that Congress was concerned with the theft of American trade secrets abroad and intended the DTSA to have extraterritorial reach. See 18 U.S.C. § 1837 (providing for extraterritorial applicability under certain circumstances); see, e.g., Pub L. 114-153, 130 Stat 376, 383-84 § 5 ("It is the sense of Congress that . . . (1) trade secret theft occurs in the United States and around the world; (2) trade secret theft, wherever it occurs, harms the companies that own the trade secrets and the employees of the companies"); S. Rep. No. 114-220 at 1-2, 11-12 (2016); H. Rep. No. 114-529 at 3-4, 15-16 (2016). But the bare fact that a law provides a federal cause of action with some extraterritorial reach does not prevent private parties from contracting either outside it or around it. Here, the mere existence of the DTSA — without any showing that the DTSA was linked to the parties' negotiations — does not inhibit a court's enforcement of the parties' forum-selection choices. See, e.g., Fintech Fund, F.L.P. v. Horne, 836 F. App'x 215, 227 (5th Cir. 2020) (affirming dismissal of case involving DTSA claim based on forum-selection clause designating England as forum).

The sockdolager, of course, is that — despite very general statements that the DTSA was intended to allow enforcement in federal court and that Congress was concerned by foreign trade secret theft — Amyndas has produced no compelling evidence that the forum-selection clause here "contravene[s] a strong public

- 31 -

policy." M/S Bremen, 407 U.S. at 15; see Rafael Rodríguez Barril, Inc. v. Conbraco Indus., Inc., 619 F.3d 90, 93-95 (1st Cir. 2010). Tellingly, Amyndas has identified no case in which a court concluded that the DTSA has been construed to trump a valid forum-selection clause. We decline to blaze a new trail through this uncharted terrain.

Amyndas next contends that the public interest in judicial economy warrants keeping all parties in the district court action because it would be inefficient and, thus, unreasonable to require Amyndas to litigate in Denmark while allowing its litigation against Alexion (and, possibly, Zealand US) to proceed in the district court. But Amyndas's private inconveniences in litigating its claims in Denmark were wholly foreseeable at the time Amyndas signed the CDAs and, thus, its private inconveniences bear no weight. See Atl. Marine, 571 U.S. at 64. To cinch the matter, public interest factors will rarely tip the balance: "forum-selection clauses should control except in unusual cases." Id. This is not so rare a case.

Assuming without deciding that judicial economy concerns may, under special circumstances, override a mandatory forum-selection clause, Amyndas has failed to show that any such sufficiently compelling circumstances are present here. Virtually all of the cases that Amyndas cites in support of this argument

involve section 1404 transfer requests[4] and/or predate Atlantic Marine's injunction that "forum-selection clauses should control except in unusual cases." Id. We see no principled basis for accepting Amyndas's invitation to keep Zealand Pharma in the district court action in the interest of judicial economy.

We do not gainsay that Amyndas may now regret negotiating a forum-selection provision that gives Zealand Pharma home-court advantage and a more favorable choice of law for the trade secret dispute that has arisen. Those regrets may coalesce into a bitter lesson about looking at a nascent partnership through rose-colored glasses. But they are not a sufficient reason for disregarding the plain text and manifest purpose of a valid forum-selection clause.

That ends this aspect of the matter. We conclude that the forum-selection clause is valid and enforceable. Under its terms, Amyndas's claims against Zealand Pharma must be litigated in a Danish court. Accordingly, we uphold the district court's dismissal of Amyndas's claims against Zealand Pharma.

**B**

This brings us to Amyndas's claims against Zealand US. The district court dismissed the claims contained in the original

---

[4] Section 1404 places a premium on considerations of judicial economy. See Cont'l Grain Co. v. The FBL-585, 364 U.S. 19, 26 (1960).

complaint against Zealand US. The court noted that the complaint largely referred to "Zealand" as a single entity and did not specify whether and how Zealand US was involved. See Amyndas, 2021 WL 4551433, at *2-3. Twenty-eight days later, Amyndas sought leave to amend. Amyndas annexed to its motion a proposed amended complaint pleading its claims against each Zealand defendant separately. The district court denied leave to amend, and Amyndas appeals the denial with respect to its claims against Zealand US.[5]

The Civil Rules take a liberal stance toward the amendment of pleadings, consistent with the federal courts' longstanding policy favoring the resolution of disputes on the merits. See Foman v. Davis, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). Rule 15(a) permits amendments with leave of court, which the court "should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of

---

[5] In the alternative, Amyndas asked the district court to reconsider the earlier order of dismissal. For all practical purposes, though, the original complaint has dropped out of the case.

- 34 -

allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be 'freely given.'" Foman, 371 U.S. at 182; see Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).

A denial of leave to amend is reviewed for abuse of discretion. See Palmer, 465 F.3d at 30. A district court's "discretion is necessarily broad—but it is not absolute." Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988). An "[a]buse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Id.

With respect to the claims against Zealand US, the district court's stated reasons for rejecting the proposed amended complaint and denying leave to amend fall into two recognizable buckets: undue delay and futility. As to undue delay, the court observed that "at no point in the course of the motion to dismiss process did Amyndas request . . . leave to amend its pleading" and "[i]nstead, it waited until nearly a month had elapsed following the challenged Order before it first made such a request." Moreover, "the factual allegations Amyndas [sought] to add were publicly available prior to the hearing on the original motion to dismiss." The allegations, the court stated, were "not 'new,' and

justice does not require that Amyndas be permitted to belatedly add them."

As to futility, the court ruled — without dissecting the substance of any of the allegations in the proposed amended complaint — that "none of the additional factual allegations change the analysis . . . presented by the prior motion to dismiss." It concluded that "the proposed additional factual allegations" do not "plausibly allege a basis to conclude . . . that Amyndas has stated claims directly against Zealand US." Thus, the court said, "Amyndas's request for leave to amend is futile."

Amyndas challenges both of the district court's stated grounds on appeal. We consider each ground in turn.

**1**

A motion for leave to file an amended complaint "requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations." Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1517 (1st Cir. 1989); see Palmer, 465 F.3d at 30-31. Although delay alone is not a sufficient basis for denying leave to amend, undue delay assuredly is. See, e.g., Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016) (explaining that "undue delay, on its own, may be enough to justify denying a motion for leave to amend"); Hayes v. N. Eng. Millwork Distribs., Inc., 602 F.2d 15, 19 (1st Cir. 1979)

(similar). When a party has allowed a "considerable period of time" to elapse, it must "show some 'valid reason for [its] neglect and delay.'" Hayes, 602 F.2d at 19-20; see In re Lombardo, 755 F.3d 1, 3 (1st Cir. 2014) (Souter, J.) ("[W]e have repeatedly said that when considerable time has elapsed . . . , the movant has [at the very least] the burden of showing some valid reason for his neglect and delay." (internal quotation marks omitted) (second alteration in original)); Calderón-Serra v. Wilmington Tr. Co., 715 F.3d 14, 20 (1st Cir. 2013) ("Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend."). Thus, for delay to be "undue," the period of delay must be both substantial and unjustified.

Determining how long is too long depends on the facts and circumstances of each particular case. This inquiry considers the reasonableness of the time between the filing of the motion for leave and a variety of points at which a party would become aware of a need to amend, such as the filing of a motion to dismiss, a dismissal order, or the discovery of new information that substantially alters the substance or viability of the claims. See Hagerty, 844 F.3d at 34-35. Ascertaining whether a delay is "undue" is not simply a matter of counting days but, rather, depends on the "totality of the circumstances" in the particular case. Palmer, 465 F.3d at 31.

Of course, the reason offered for seeking leave to amend must be a "valid" one. See, e.g., Lombardo, 755 F.3d at 3; Hayes, 602 F.2d at 20. Generally, valid reasons include a motion to dismiss or a ruling from the court pointing out flaws in the original pleading or the discovery of new information. This is not a high hurdle, and the dispositive datum often will be the reasonableness of the pleader's actions. But even if the reasons are valid, the court must consider whether and to what extent the opposing party would be unfairly prejudiced as a result of a delayed amendment. See Zenith Radio Corp. v. Hazeltine Rsch., Inc., 401 U.S. 321, 330-31 (1971); Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011).

In particular cases, other factors may weigh in the balance. For instance, a court may consider whether a proposed amendment is a first attempt. See City of Mia. Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp., __ F.4th __, __ (1st Cir. 2022) [No. 21-1479, slip op. at 28] (affirming denial of leave to amend when plaintiffs sought "a third bite of the apple in the form of a second amended complaint"); Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006). Serial amendments may be given closer scrutiny in terms of timing because "busy trial courts, in the responsible exercise of their case management functions, may refuse to allow plaintiffs an endless number of trips to the well." Aponte-Torres, 445 F.3d at 58. So, too, the

existence of related litigation may be a factor in the decisional calculus.  See, e.g., Nikitine v. Wilmington Tr. Co., 715 F.3d 388, 389-91 (1st Cir. 2013).

In the case at hand, Amyndas had a valid reason for moving to amend:  the district court had pointed out a fatal flaw in its original complaint (the failure to differentiate sufficiently between Zealand Pharma and Zealand US with respect to liability for the claims asserted).  Although Amyndas moved for leave to amend only twenty-eight days after the district court dismissed its original complaint, the court found undue delay. The district court's finding of undue delay was based on two particular circumstances.  First, it faulted Amyndas for not requesting leave to amend during the motion-to-dismiss process, "even as an alternative."  Waiting four weeks after the dismissal order to request leave to amend, the court concluded, was simply too late.[6]  Second, the court concluded that many of the additional facts added in the proposed amended complaint were publicly available prior to the hearing on the motion to dismiss the

---

[6] Amyndas says that it did request leave to amend earlier in the process.  In a footnote to its filings in opposition to the Zealand entities' motion to dismiss, it requested at a "minimum, or in the alternative, . . . early discovery regarding Zealand US to allow Plaintiffs the opportunity to amend their Complaint, if necessary."  The general rule, however, is that a district court need not pay heed to a contingent request for leave to amend made only in opposition papers.  See Fisher v. Kadant, Inc., 589 F.3d 505, 509 (1st Cir. 2009).

original complaint and, thus, were not "new." Accordingly, "justice d[id] not require that Amyndas be permitted to belatedly add" its allegations.

Although the timing of a request for leave to amend and the relative novelty of the added allegations contained in the proposed amended complaint are relevant considerations, the district court's reasoning does not pass muster. Amyndas's delay in filing its motion for leave to amend fell well short of the timeframes that our cases have identified as undue and cannot, under all the circumstances, be characterized as substantial. Nor does the record, fairly read, suggest that Amyndas was dilatory. Amyndas filed its original complaint in December of 2021, faced a motion to dismiss from the Zealand defendants in March of 2022, had a hearing on that motion in May, and received the decision in June. It filed its motion for leave to amend a scant twenty-eight days later.

The mere fact that Amyndas's motion for leave to amend came after the district court dismissed the original complaint is not sufficient to ground a conclusion that the motion was unduly delayed. It is common ground that "[a]mendments may be permitted pre-judgment, even after a dismissal for failure to state a claim." Palmer, 465 F.3d at 30. After all, the "when justice so requires" standard of Rule 15(a) puts a thumb on the scale in favor of allowing amendments in non-frivolous cases. See Foman, 371 U.S.

at 182.  Amyndas moved to amend before the district court entered judgment and, thus, Rule 15's more liberal standards apply here.[7]

Withal, we have understandably condemned "wait and see" amendment practices:  a plaintiff may not, for instance, "deliberately wait in the wings for a year and a half with another amendment to a complaint should the court hold the first amended complaint was insufficient." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 57 (1st Cir. 2008); see Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 61 (1st Cir. 2018); Palmer, 465 F.3d at 30-31. But here, there is no reason to conclude that Amyndas engaged in any such "wait and see" practices.  Amyndas filed its motion to amend less than two months after the emergence of new evidence. And the amended complaint specifically addressed a defect identified by the district court in its dismissal of the original complaint:  Amyndas's failure to differentiate sufficiently its claims between Zealand Pharma and Zealand US.  See Amyndas, 2021 WL 4551433, at *2-3.

Although it is true that the Zealand defendants moved to dismiss based, in part, on that same defect, a relatively short period of time ensued between the date when Zealand's motion put

_____

[7] These standards contrast with the somewhat stricter standards governing post-judgment motions to amend.  See CVS Health, __ F.4th at __ [No. 21-1479, slip op. at 29] (emphasizing that plaintiffs sought leave to amend after judgment had entered so "Rule 15 was no longer on the table").

Amyndas on notice of the defect and the date when Amyndas moved to amend. The length of the delay is, of course, a critical data point in determining whether a period of delay is "undue." See, e.g., Hagerty, 844 F.3d at 35 (denying motion to amend in face of year-long delay); Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 538 (1st Cir. 2011) (denying motion to amend in face of gap of "nearly a year"); Advest, 512 F.3d at 57 (faulting "year and a half" delay). Equally as important, this was not a case in which the plaintiff's complaint contained such an obvious defect that it was unreasonable to wait until the district court ruled on the motion to dismiss before moving to amend.

The district court's second ground for concluding that there was undue delay — that the allegations in the proposed amended complaint were not "new" — is no more convincing. We agree that most of the facts undergirding Amyndas's proposed amended complaint were available before the hearing on the motion to dismiss. But that circumstance, taken in a vacuum, cannot serve as a basis for denying Amyndas's motion to amend. Responding specifically to one of the district court's grounds for dismissal by realigning previously articulated facts — as Amyndas did here — is a legitimate basis for amendment.

We add, moreover, that this is a complex case in which ramified issues are at play. Especially in complex cases, lawyers ought not to be expected to cobble together pleadings at breakneck

speed. Taking four weeks to assimilate information — including information not publicly available until the day before the motion-to-dismiss hearing — and to separate Amyndas's claims against Zealand US from its claims against Zealand Pharma is within the realm of reasonableness. As a result, Amyndas's delay cannot be fairly characterized as "undue."

In addition, Amyndas's proposed amended complaint incorporated new information, not available to it when it drafted its original complaint. On this point, we reject the Zealand defendants' suggestion that a press release regarding trials of a complement therapeutic, issued jointly by Alexion and the Zealand entities on the day before the motion-to-dismiss hearing, could not be regarded as "new" for purposes of Amyndas's proposed amended complaint. A party is not required to seek leave to amend its complaint each time a new piece of favorable information surfaces unless that new information is essential to the viability of its case. Although parties should ordinarily take their best shot and not sit on new facts, see, e.g., Kader, 887 F.3d at 61; Villanueva, 662 F.3d at 127, they should not be expected either to plead their cases in granular detail, see Fed. R. Civ. P. 8(a)(2) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"), or to seek leave to amend the very moment a few more facts come to light.

To sum up, Amyndas had a valid reason for seeking leave to amend and acted with reasonable diligence to cure the fatal defect in its original complaint and to put a proposed amended complaint before the district court. Its proposed amended complaint not only made changes that were directly responsive to the district court's stated reasons for dismissing the original complaint but also incorporated some new information. Given the totality of the circumstances, the twenty-eight-day period that elapsed between the dismissal of the original complaint and the filing of the motion to amend cannot fairly be characterized as "undue delay."

**2**

The district court also cited futility as a further ground for denying leave to amend. A proposed amendment is futile if it is either frivolous or contains some fatal defect. See Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed. 2022). Normally, this means that "the complaint, as amended, would fail to state a claim upon which relief could be granted." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).

Whether a proposed amendment is futile is "gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)." Juarez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 276 (1st Cir. 2013); Hatch v. Dep't of Child., Youth

& Their Fams., 274 F.3d 12, 19 (1st Cir. 2001). Reference to those criteria teaches that if the amended complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)), and contains no other fatal defects, the district court abuses its discretion by denying the motion to amend on futility grounds, see Abraham v. Woods Hole Oceanographic Inst., 553 F.3d 114, 117 (1st Cir. 2009); see also Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.").

The issue, then, is whether the proposed amended complaint states a facially plausible claim against Zealand US. For a start, the proposed amended complaint specifically differentiated between Zealand Pharma and Zealand US, thus curing the defect that the district court had specifically noted with respect to the original complaint. See Amyndas, 2021 WL 4551433, at *2-3. Amyndas's proposed amended complaint alleged separate counts against Zealand US for misappropriation of trade secrets under the DTSA (count VIII), misappropriation of trade secrets under Massachusetts General Laws chapter 93, section 42 (count

- 45 -

IX), misappropriation of trade secrets under common law (count X), unfair competition (count XI), and unjust enrichment (count XII). Those allegations were sufficiently specific. For example, the proposed amended complaint contained allegations to support the proposition that Zealand US was engaged in the continuing use of Amyndas's improperly retained trade secrets, which (Amyndas posited) formed the basis for misappropriation claims under both federal and state law. See 18 U.S.C. §§ 1839(5)(A)-(B), 1836(d); Mass. Gen. Laws ch. 93, § 42; see also Oakwood Lab'ys LLC v. Thanoo, 999 F.3d 892, 909 (3d Cir. 2021).

Amyndas's allegations as to misappropriation in the proposed amended complaint included:

- "Zealand U.S. impermissibly acquired and accessed, and continues to impermissibly have access to Amyndas' trade secrets through Zealand A/S, which has failed to destroy all Amyndas trade secret information or information derived therefrom, or to erect walls to prevent improper disclosure to Zealand U.S., in view of the termination of the Amyndas-Zealand discussions in 2017. "
- "[T]he Alexion-Zealand collaboration is, on information and belief, intended to research, develop, and commercialize technology improperly derived from Amyndas' trade secrets in the field of peptide pharmaceutical products, and Zealand U.S., as the arm of Zealand responsible for such efforts in the U.S. with respect to such peptide pharmaceutical products is, on information and belief, directly involved with those efforts."
- "[O]n information and belief, Zealand U.S., and its officers acting on behalf of Zealand U.S., participate in efforts relating to obtaining FDA approval for Zealand's peptide-

- 46 -

based medicines, such as the recently-approved [product targeting the C3 protein]. Therefore . . . Zealand U.S. and its officers have used and are currently using Amyndas' trade secrets in furtherance of the business purposes of Zealand U.S."

- "On information and belief, Zealand U.S. acts, at a minimum, as Zealand's representative to Alexion in connection with discussions, approvals and other developments related to Alexion's efforts to commercialize the products subject to the Zealand-Alexion agreement."

These allegations, when viewed in combination, define a distinct course of conduct by Zealand US and connect that course of conduct to the unauthorized use of Amyndas's trade secrets. Taken as true — as they must be, see Iqbal, 556 U.S. at 678-79 — they adumbrate facially plausible claims for the misappropriation of trade secrets.

The allegations supporting the claims for unfair competition and unjust enrichment are similarly specific. The proposed amended complaint, taken as a whole, seemingly states plausible claims upon which relief could be granted. Yet, the district court did not engage with these allegations. Rather, it focused much of its futility analysis on the forum-selection clause. The only references to Zealand US contained in its minute order are conclusory.

Courts must take account of the reality of events. In a case like this one, much of the information concerning the division of roles, responsibilities, and potential wrongdoing will

- 47 -

be in the possession of the defendants and may not become visible until after discovery is completed. Cf. Grant v. News Grp. Bos., Inc., 55 F.3d 1, 5 (1st Cir. 1995) (observing, in Title VII context, that district courts should be cautious about too quickly denying leave to amend in cases in which discovery will be essential to development of claims). The fact that Amyndas unarguably cured the fatal defect in the original complaint that had been identified by the district court, coupled with the nature, detail, and apparent plausibility of Amyndas's claims, renders a finding of futility insupportable.

### 3

We summarize succinctly. Amyndas sought to file a proposed amended complaint that stated facially plausible claims for relief against Zealand US. That represented Amyndas's first attempt at amendment. The district court's conclusion that Amyndas unduly delayed in moving for leave to file that complaint is insupportable, as is the district court's conclusion that the asserted claims are futile. And, finally, Zealand US has not advanced any credible claim of prejudice. We conclude, therefore, that the district court's denial of the motion to amend constituted an abuse of discretion. Consequently, both its denial of that motion and its subsequent dismissal of Amyndas's claims against Zealand US must be vacated, and the case must be remanded for further proceedings consistent with this opinion.

## IV

We need go no further.  For the reasons elucidated above, we <u>affirm</u> the dismissal of Amyndas's claims against Zealand Pharma.  We <u>vacate</u> the dismissal of Amyndas's claims against Zealand US and <u>remand</u> for further proceedings consistent with this opinion.  All parties shall bear their own costs.

**<u>Affirmed in part, vacated in part, and remanded</u>**.